Patrick R. Leverty, Esq., NV Bar No. 8840
William R. Ginn, Esq., NV Bar No. 6989
LEVERTY & ASSOCIATES LAW CHTD.
832 Willow Street
Reno, Nevada 89502
Ph. (775) 322-6636
Fax: (775) 322-3953
*Attorney for Plaintiff*

(Additional Counsel on Signature Page)

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

JORDAN MICELI, derivatively on behalf of GENIUS BRANDS INTERNATIONAL, INC.,

     Plaintiff,

     v.

ANDY HEYWARD, ROBERT L. DENTON, JOSEPH DAVIS, P. CLARK HALLREN, MICHAEL KLEIN, MARGARET LOESCH, LYNNE SEGALL, and ANTHONY D. THOMOPOULOS,

     and

GENIUS BRANDS INTERNATIONAL, INC.,

     Nominal Defendant.

Case No. 3:21-cv-132

**VERIFIED STOCKHOLDER DERRIVATIVE COMPLAINT**

**JURY TRIAL DEMANDED**

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff Jordan Miceli ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant Genius Brands International, Inc. ("Genius" or the "Company"), files this Verified Shareholder Derivative Complaint against Defendants Andy Heyward ("Heyward"), Robert L. Denton ("Denton"), Joseph Davis ("Davis"), P. Clark Hallren ("Hallren"), Michael Klein ("Klein"), Margaret Loesch ("Loesch"), Lynne Segall ("Segall") and Anthony D. Thomopoulos ("Thomopoulos") (collectively, the "Individual Defendants," and together with Genius, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Genius, unjust enrichment, waste of corporate assets, and for violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act").  As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls, and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Genius, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1. This is a shareholder derivative complaint brought in the right, and for the benefit, of Genius against certain of its officers and directors seeking to remedy the Individual Defendants' wrongdoings committed from March 17, 2020 through July 5, 2020, both dates inclusive (the

"Relevant Period").2. Genius is a content and brand management company based in California and incorporated in Nevada. The Company specializes in the creation and licensing of multimedia content for toddlers and tweens. Recent, and relevant, endeavors of the Company include the launch of (1) "Rainbow Rangers," an animated television program for children; (2) "Kartoon Channel!" a wholly-owned media distribution outlet; and (3) "Stan Lee Universe," a joint venture which owns and is attempting to utilize the late comic book writer Stan Lee's unreleased intellectual property – work he created after his time with Marvel.

3.      Immediately preceding the Relevant Period, the Company's stock price was steadily trading at less than $1.00 per share. As a result, Genius was at risk of being delisted from the NASDAQ.

4.      On March 30, 2020, the Company filed its annual report on Form 10-K for the fiscal year ended December 31, 2019 (the "2019 10-K"). Pursuant to the 2019 10-K, Genius incurred an operating loss each fiscal quarter from its inception due to both skyrocketing costs and expenses in the short term and its inability to create reliable and significant revenue streams in the long term. The 2019 10-K indicated that due to these problems, the Company would not be able to continue to operate if it did not secure additional financing.

5.      On March 13, 2020, and throughout the Relevant Period, defendant Heyward and the Individual Defendants aggressively promoted Genius's products, including Rainbow Rangers, the Kartoon Channel!, and the Stan Lee Universe, by way of repeated materially false and misleading statements and omissions. The Company utilized predatory promotional tactics aimed towards retail "Robinhood investors," in order to artificially pump up the value of the Company's share price.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

6.      For example, the Company issued a press release on March 17, 2020 titled "Nickelodeon Expands Daily Broadcasts of Genius Brand International's Hit Preschool Series, Rainbow Rangers" (the "March 17 Rainbow Press Release") announcing Nickelodeon's decision to increase the broadcasts of Rainbow Rangers to 26 airings per week.  However, in reality, this was not the case.  On June 5, 2020, Hindenburg Research published a report entitled "A Bagholder's Guide to Why We Think Genius Brands Will Be a $1.50 Stock Within a Month" (the "Hindenburg Report") which reported that Nickelodeon was actually only broadcasting Rainbow Readers *nine* times per week at unfavorable time slots.

7.      Further, the Company issued press releases on May 13, 2020 and June 12, 2020, calling its new Kartoon Channel! "Netflix for kids, but free" and claiming it to be "fully ad-supported" and an "economic vaccine for Covid-19."  However, the Company's affirmation that "[t]here is no subscription fee" for Kartoon Channel! proved untrue.  Upon its launch on June 15, 2020, Kartoon Channel! was only available to Amazon Prime members as an add-on channel for an additional subscription fee.

8.      Before the truth regarding the Individual Defendant's tactics was revealed, the Company's stock price skyrocketed, increasing more than 5000% from March 16, 2020 to June 3, 2020.  On June 3, 2020, after trading under $1 per share for nearly a year, Genius stock reached a closing high of $7.93 per share, and during trading on June 4, 2020, the stock hit an intra-day high of $11.93 per share.

9.      During the Relevant Period, Genius also conducted five separate direct offerings of shares to certain "long standing investors" through which Genius sold more than 50 million shares at below-market valuations while raising millions of dollars in liquid capital.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

10.     On or about June 11, 2020, while the Company's stock was still trading at over 2000% more than it was trading for only three months earlier, Genius announced that "selling shareholders" would resell approximately 60 million shares to the market.

11.     On June 19, 2020, while the valuation of the Company's stock was still approximately 1300% more than it had been in March, defendant Heyward sold 460,574 shares of Genius stock at $2.94 per share, for gross proceeds of approximately $1.3 million.  This sale came only 11 days after defendant Heyward assured investors that he had not "sold a single share" of Genius stock.

12.     Through June and July 2020, as the Hindenburg Report, the Company's SEC Filings, and the Company's press releases, among other things, revealed the truth regarding defendant Heyward's and the Individual Defendant's false and misleading statements regarding the Company's products, valuation, and growth potential, the Company's stock began to decrease sharply.  For example, Genius's stock closed at $3.97 per share on June 9, 2020, dropping 50% from its close of $7.93 on June 3, 2020, only a few trading days earlier.

13.     Despite the sharp decrease in the Company's stock price, defendant Heyward's and the Individual Defendant's hyperbolic claims regarding the Company's outlook, including current commercial prospects, and future growth potential endured.  On July 2, 2020, the Company published a press release stating that it would be hosting a conference call with investors to announce an "exciting" and "key" business development on July 6, 2020.

14.     The July 6, 2020 announcement, however, was merely that the Company was starting a joint venture with Stan Lee, whom they had already announced a collaboration with many months earlier.  To the investing public, it was now clear that the Company did not, in fact, have any significant update.

15.     After the July 6, 2020 announcement, the Company's stock price began to fall. On July 2, 2020, before the announcement, the price of Genius's common stock closed at $3.55 per share.  By the close of trading on July 6, 2020, the price of the Company's common stock fell to $2.66 per share, a drop in value of over 25%, on massive trading volume.  In fact, the intra-day low on July 6, 2020, after the announcement was $2.58, representing a drop in value of 27%. [1]

16.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements about Genius's business, operations, and compliance. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public, including: (1) failing to disclose that Rainbow Rangers had not been renewed for a new season on Nick Jr.; (2) failing to disclose that Rainbow Rangers was airing on Nickelodeon only nine times per week, rather than 26 times as Genius had previously represented, and at unfavorable time slots; (3) not disclosing that the economic terms of the deal with Llama Llama, and it did not own the intellectual property for Llama Llama and merely licensed it; (4) failing to disclose that a new wave of selling was likely to pummel the Company's stock as its financial backers sought to lock in profits; (5) posting Stan Lee's Superhero Kindergarten as content on Amazon as self-marketing for the show, which was a far less desirable accomplishment than previously represented; (6) implying Genius had the potential to, like the Walt Disney Company, earn billions of dollars in revenue from the box office, even though Genius had been attempting to launch a show with Stan Lee as early as 2011 and had no meaningful commercial success since that time, let alone the "billions of dollars" of success;

---

[1]  For example, approximately 17,607,500 shares of the Company's stock were traded just two business days prior, on July 1, 2020.

and (7) failing to disclose how Mr. Lee's passing would impact Genius's purported ability to replicate Disney's success.

17.    The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

18.    Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

19.    Furthermore, during the Relevant Period, defendant Heyward breached his fiduciary duties by making a lucrative insider sale, obtaining proceeds of over $1.3 million.

20.    In light of the Individual Defendants' misconduct, which has subjected Genius and its Chairman and Chief Executive Officer ("CEO") to being named as defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the Central District of California (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses due to the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the  Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

21.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the CEO's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Genius's Board of Directors (the "Board") cannot consider a demand to

commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

### JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9.

23.     Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332.  Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

24.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

25.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

26.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation incorporated in this District, or he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

27.     Venue is proper in this District because Genius incorporated in this District, the Individual Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

# PARTIES

## Plaintiff

28.     Plaintiff is a current holder of Genius common stock and has continuously held Genius common stock since March 13, 2020.  Plaintiff is a citizen of Florida.

## Nominal Defendant Genius

29.     Nominal Defendant Genius is a Nevada corporation with its principal executive office located at 1900 Canon Drive, Floor 4, Beverly Hills, CA 90210.  Genius's shares trade on the NASDAQ under the ticker symbol GNUS.

## Defendant Heyward

30.     Defendant Heyward is the Company's founder and has served as Genius's Chairman and CEO since 2013.  Pursuant to the Company's Schedule 14A filed on April 14, 2020 (the "2020 Proxy Statement"), as of March 30, 2020, Heyward beneficially owned 3,019,949 shares of the Company's common stock, which, as of that date, represented 9.99% of the Company's outstanding shares of common stock.  Per the closing price of the Company's common stock of $0.28 on March 30, 2020, Defendant Heyward owned approximately $845,586 worth of Genius stock.

31.     For the fiscal year ended December 31, 2019, in exchange for his services as Genius's Chairman and CEO, defendant Heyward received $967,994 in compensation from the Company.  This includes $411,500 in salary, $287,500 in option awards, and $124,000 in all other compensation.

32.     On June 19, 2020, defendant Heyward sold 460,574 shares of Genius stock for $2.94 per share, for a total of $1,354,087 in proceeds.  This sale occurred during the period when the Company was materially misstating information to the investing public to keep the stock price inflated, and before the scheme was exposed.  Defendant Heyward made no purchases of Genius

8

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

stock during this period.  Heyward's insider sale made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

33.     The Company's 2020 Proxy Statement states the following regarding Defendant Heyward:

> *Andy Heyward, 71,* has been the Company's Chief Executive Officer since November 2013 and the Company's Chairman of the Board since December 2013. Mr. Heyward co-founded DIC Animation City in 1983 and served as its Chief Executive Officer until its sale in 1993 to Capital Cities/ ABC, Inc. which was eventually bought by The Walt Disney Company in 1995.  Mr. Heyward ran the company while it was owned by The Walt Disney Company until 2000 when Mr. Heyward purchased DIC Entertainment L.P. and DIC Productions L.P, corporate successors to the DIC Animation City business, with the assistance of Bain Capital and served as the Chairman and Chief Executive Officer of their acquiring company DIC Entertainment Corporation, until he took the company public on the AIM.  He sold the company in 2008.  Mr. Heyward co-founded A Squared Entertainment LLC in 2009 and has served as its Co-President since inception.  Mr. Heyward earned a Bachelor of Arts degree in Philosophy from UCLA and is a member of the Producers Guild of America, the National Academy of Television Arts and the Paley Center (formerly the Museum of Television and Radio).  Mr. Heyward gave the Commencement address in 2011 for the UCLA College of Humanities and was awarded the 2002 UCLA Alumni Association's Professional Achievement Award. He has received multiple Emmys and other awards for Children's Entertainment. He serves on the Board of Directors of the Cedars Sinai Medical Center.  Mr. Heyward has produced over 5,000 half hour episodes of award winning entertainment, among them *Inspector Gadget*; *The Real Ghostbusters*; *Strawberry Shortcake*; *Care Bears*; *Alvin and the Chipmunks*; *Hello Kitty's Furry Tale Theater; The Super Mario Brothers Super Show; The Adventures of Sonic the Hedgehog*; *Sabrina The Animated Series*; *Captain Planet and the Planeteers*; *Liberty's Kids*, and many others.  Mr. Heyward was chosen as a director because of his extensive experience in children's entertainment and as co-founder of A Squared Entertainment.

34.     Upon information and belief, defendant Heyward is a citizen of California.

**Defendant Denton**

35.     Defendant Denton is the Company's Chief Financial Officer ("CFO"), having served since April 2018.  Pursuant to the 2020 Proxy Statement, as of March 30, 2020, defendant Denton beneficially owned 71,726 shares of the Company's common stock.  Per the closing price

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

of the Company's common stock of $0.28 on March 30, 2020, defendant Denton owned approximately $20,083 worth of Genius stock.

36.     For the fiscal year ended December 31, 2019, in exchange for his services as Genius's CFO, defendant Denton received $262,439 in compensation from the Company. This includes $215,625 in salary, $25,000 in bonus, and $21,814 in option awards.

37.     The Company's 2020 Proxy Statement states the following regarding defendant Denton:

> *Robert Denton, 60*, has been our Chief Financial Officer since April 18, 2018. He served as the Chief Financial Officer of Atlys, Inc. a next-gen media technology company from 2011 to 2018. He has over 30 years of experience as a financial executive, specifically in the entertainment industry. He began his career in 1982 with Ernst & Young handling filings with the Securities and Exchange Commission, including initial public offerings. He left Ernst & Young in 1990 to work as Vice President and Chief Accounting Officer for LIVE Entertainment, Inc. In 1996, LIVE was acquired by Artisan Entertainment, Inc., and, in December 2000, Mr. Denton was promoted to Executive Vice President of Finance and CAO. Mr. Denton also served as the COO of Artisan Home Entertainment, where he directed all financial reporting, budgeting and forecasting, manufacturing and distribution of the Home Entertainment Division. Mr. Denton left Artisan at the end of 2003 and joined DIC Entertainment Corporation to serve as their Chief Financial Officer. At DIC, he directed the three-year financial audit, due diligence and preparation of the company's Admission Documents, and he was responsible for all monthly financial reporting to the Board of Directors as well as the semi-annual reporting to the AIM Exchange of the London Stock Exchange. Mr. Denton left DIC in February 2009 after completing the acquisition and transition of DIC to the Cookie Jar Company. Mr. Denton served as the Chief Financial Officer of Gold Circle Films from 2009 to 2011. From 2009 to 2014, Mr. Denton also owned and operated three Assisted Living Facilities for the Elderly, to help better care for his mother. Mr. Denton is a Certified Public Accountant and a member of the American Institute of Certified Public Accountants and the California Society of Certified Public Accountants.

38.     Upon information and belief, Defendant Denton is a citizen of California.

**Defendant Davis**

39.     Defendant Davis has served as a director of the Company since December 2013 where he has served as a member of the Board's Nominating committee since March 19, 2020.

Pursuant to the 2020 Proxy Statement, as of March 30, 2020, defendant Davis beneficially owned 13,335 shares of the Company's common stock.  Per the closing price of the Company's common stock of $0.28 on March 30, 2020, defendant Davis owned approximately $3,734 worth of Genius stock.

40.    For the fiscal year ended December 31, 2019, in exchange for his services as a member of Genius's Board, defendant Davis received $20,000 in compensation from the Company.  Defendant Davis' compensation consisted entirely of fees earned or paid in cash.

41.    The Company's 2020 Proxy Statement states the following regarding defendant Davis:

> *Joseph "Gray" Davis, 77,* has been a Director of the Company since December 2013.  Mr. Davis served as the 37th governor of California from 1998 until 2003.  Mr. Davis currently serves as "Of Counsel" in the Los Angeles, California office of Loeb & Loeb LLP.  Mr. Davis has served on the Board of Directors of DIC Entertainment and is a member of the bi-partisan Think Long Committee, a Senior Fellow at the UCLA School of Public Affairs and Co-Chair of the Southern California Leadership Counsel.  Mr. Davis received his undergraduate degree from Stanford University and received his Juris Doctorate from Columbia Law School.  Mr. Davis served as lieutenant governor of California from 1995-1998, California State Controller from 1987-1995 and California State Assemblyman from 1982-1986.  Mr. Davis was chosen as a director of the Company based on his knowledge of corporate governance.

42.    Upon information and belief, defendant Davis is a citizen of California.

**Defendant Hallren**

43.    Defendant Hallren has served as a director of the Company since May 2014, where he also serves as the Chair of the Audit Committee and as a member of the Compensation and Nominating Committee.  Pursuant to the 2020 Proxy Statement, as of March 30, 2020, defendant Hallren beneficially owned 13,335 shares of the Company's common stock.  Per the closing price

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1
2

of the Company's common stock of $0.28 on March 30, 2020, defendant Hallren owned approximately $3,734 worth of Genius stock.

3
4
5
6

44.     For the fiscal year ended December 31, 2019, in exchange for his services as a member of Genius's Board, defendant Hallren received $20,000 in compensation from the Company.  Defendant Hallren's compensation consisted entirely of fees earned or paid in cash.

7
8

45.     The Company's 2020 Proxy Statement stated the following regarding defendant Hallren:

9
10
11
12
13
14
15
16
17
18
19

> *P. Clark Hallren, 58,* has been a Director of the Company since May 2014. Since August 2013, Mr. Hallren has been a realtor with HK Lane/Christie's International Real Estate and since August 2012, Mr. Hallren has served as an outside consultant to individuals and entities investing or operating in the entertainment industry. From August 2012 to August 2014, Mr. Hallren was a realtor with Keller Williams Realty and from August 2009 to August 2012, Mr. Hallren founded and served as managing partner of Clear Scope Partners, an entertainment advisory company. From 1986 to August 2009, Mr. Hallren was employed by JP Morgan Securities Inc. in various capacities, including as Managing Director of the Entertainment Industries Group. I n his roles with JP Morgan Securities, Mr. Hallren was responsible for marketing certain products to his clients, including but not limited to, syndicated senior debt, public and private subordinated debt, public and private equity, securitized and credit enhanced debt, interest rate derivatives, foreign currency and treasury products.  Mr. Hallren holds Finance, Accounting and Economics degrees from Oklahoma State University.  He also currently holds Series 7, 24 and 63 securities licenses.  Mr. Hallren was chosen as a director of the Company based on his knowledge and experience in the entertainment industry as well as in banking and finance.

20
21

46.     Upon information and belief, defendant Hallren is a citizen of California.

22

**Defendant Klein**

23
24
25
26
27

47.     Defendant Klein has served as a director of the Company since March 2019 where he has also served as a member of the Audit Committee and the Nominating Committee.  Pursuant to the 2020 Proxy Statement, as of March 30, 2020, defendant Klein beneficially owned 175,000 shares of the Company's common stock.  Per the closing price of the Company's common stock

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

of $0.28 on March 30, 2020, defendant Klein owned approximately $49,000 worth of Genius stock.

48.     For the fiscal year ended December 31, 2019, in exchange for his services as a member of Genius's Board, defendant Klein received $12,500 in compensation from the Company.  Defendant Klein's compensation consisted entirely of fees earned or paid in cash.

49.     The Company's 2020 Proxy Statement stated the following regarding defendant Klein:

> *Michael Klein*, *72*, was appointed as a Director of the Company since March 7, 2019.  Mr. Klein is an accomplished executive, entrepreneur, and financier with substantial experience in media and entertainment, investment banking, professional sports, venture capital funding, and real estate.  Prior to starting Camden Capital Management, LLC (CCM), Mr. Klein, since 1996, has led Klein Investment Group after assuming 100% ownership of (and renaming) Iacocca Capital Partners, L.P., where he was Managing Partner from 1994 to 1996.  From 1984 to 1993, Mr. Klein was a managing director at Bear Stearns & Company, where he founded and co-directed the Media-Entertainment Group, and Gruntal & Company, where he was Senior Managing Director and a member of the Executive Committee.  From 1974 to 1982, Mr. Klein supplied prime time and mini-series content to the major television networks through his company, Michael Klein Productions.  Also, during that time, he was an owner and a senior executive officer of the San Diego Chargers, an NFL Football franchise.  Mr. Klein has significant experience in the area of corporate financings.  He has executed and participated in financing deals, both public and private, ranging from $5 million to over $2 billion.  His real estate ventures in Southern California include a 600-acre development in North San Diego, which he sold in various stages.  He also has led several real estate ventures in Southern California including the Water Gardens phase two in Santa Monica.  Mr. Klein was chosen as a director of the Company based on his knowledge and experience in the entertainment industry as well as in banking and finance.

50.     Upon information and belief, defendant Klein is a citizen of California.

**Defendant Loesch**

51.     Defendant Loesch has served as a director of the Company since March 2015 and was appointed as the Executive Chairman of Kartoon Channel! on June 5, 2020.  Pursuant to the 2020 Proxy Statement, as of March 30, 2020, defendant Loesch beneficially owned 13, 335 shares

of the Company's common stock.  Per the closing price of the Company's common stock of $0.28 on March 30, 2020, defendant Loesch owned approximately $3,734 worth of Genius stock.

52.     For the fiscal year ended December 31, 2019, in exchange for her services as a member of Genius's Board, defendant Loesch received $17,500 in compensation from the Company.  Defendant Loesch's compensation consisted entirely of fees earned or paid in cash.

53.     The Company's 2020 Proxy Statement stated the following regarding defendant Loesch:

> *Margaret Loesch, 74,* has been a Director of the Company since March 2015 and the Executive Chairman of the Genius Brands Network since December 2016. Beginning in 2009 through 2014, Ms. Loesch, served as Chief Executive Officer and President of The Hub Network, a cable channel for children and families, including animated features.  The Company has, in the past, provided The Hub Network with certain children's programming.  From 2003 through 2009 Ms. Loesch served as Co-Chief Executive Officer of The Hatchery, a family entertainment and consumer product company.  From 1998 through 2001 Ms. Loesch served as Chief Executive Officer of the Hallmark Channel, a family related cable channel.  From 1990 through 1997 Ms. Loesch served as the Chief Executive Officer of Fox Kids Network, a children's programming block and from 1984 through 1990 served as the Chief Executive Officer of Marvel Productions, a television and film studio subsidiary of Marvel Entertainment Group. Ms. Loesch obtained her Bachelor of Science from the University of Southern Mississippi. Ms. Loesch was chosen to be a director based on her 40 years of experience at the helm of major children and family programming and consumer product channels.

54.     Upon information and belief, defendant Loesch is a citizen of California.

**Defendant Segall**

55.     Defendant Segall has served as a director of the Company since December 2013 where she serves as the Chair of the Nominating Committee.  Pursuant to the 2020 Proxy Statement, as of March 30, 2020, defendant Segall beneficially owned 13,335 shares of the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Company's common stock.  Per the closing price of the Company's common stock of $0.28 on March 30, 2020, defendant Segall owned approximately $3,734 worth of Genius stock.

56.     For the fiscal year ended December 31, 2019, in exchange for her services as a member of Genius's Board, defendant Segall received $17,500 in compensation from the Company.  Defendant Segall's compensation consisted entirely of fees earned or paid in cash.

57.     The Company's 2020 Proxy Statement stated the following regarding defendant Segall:

> *Lynne Segall, 67,* has been a Director of the Company since December 2013.  Ms. Segall has served as the Senior Vice President and Publisher of The Hollywood Reporter since June 2011.  From 2010 to 2011, Ms. Segall was the Senior Vice President of Deadline Hollywood.  From June 2006 to May 2010, Ms. Segall served as the Vice President of Entertainment, Fashion & Luxury advertising at the Los Angeles Times.   In 2005, Ms. Segall received the Women of Achievement Award from The Hollywood Chamber of Commerce and the Women in Excellence Award from the Century City Chamber of Commerce.  In 2006, Ms. Segall was recognized by the National Association of Women with its Excellence in Media Award.  Ms. Segall was chosen to be a director based on her expertise in the entertainment industry.

58.     Upon information and belief, defendant Segall is a citizen of California.

**Defendant Thomopoulos**

59.     Defendant Thomopoulos has served as a director of the Company since December 2013 where he serves as the Chair of the Compensation Committee and as a member of the Audit Committee.  Pursuant to the 2020 Proxy Statement, as of March 30, 2020, defendant Thomopoulos beneficially owned 13,450 shares of the Company's common stock.  Per the closing price of the Company's common stock of $0.28 on March 30, 2020, defendant Thomopoulos owned approximately $3,766 worth of Genius stock.

60.     For the fiscal year ended December 31, 2019, in exchange for his services as a member of Genius's Board, defendant Thomopoulos received $17,500 in compensation from the

1   Company.  Defendant Thomopoulos compensation consisted entirely of fees earned or paid in

2   cash.

3          61.      The Company's 2020 Proxy Statement stated the following regarding defendant

4   Thomopoulos:

5          *Anthony Thomopoulos, 82,* has been a Director of the Company since February
6          2014.  Mr. Thomopoulos served as the Chairman of United Artist Pictures from
           1986 to 1989 and formed Thomopoulos Pictures, an independent production
7          company of both motion pictures and television programs in 1989 and has served
           as its Chief Executive Officer since 1989.  From 1991 to 1995, Mr. Thomopoulos
8          was the President of Amblin Television, a division of Amblin Entertainment.  Mr.
9          Thomopoulos served as the President of International Family Entertainment, Inc.
           from 1995 to 1997.  From June 2001 to January 2004, Mr. Thomopoulos served as
10         the Chairman and Chief Executive Officer of Media Arts Group, a NYSE listed
11         company.  Mr. Thomopoulos served as a state commissioner of the California
           Service  Corps.  under  Governor  Schwarzenegger  from  2005  to  2008.   Mr.
12         Thomopoulos is also a founding partner of Morning Light Productions.  Since he
13         founded it in 2008, Mr. Thomopoulos has operated Thomopoulos Productions and
           has  served  as  a  consultant  to  BKSems,  USA,  a  digital  signage  company.   Mr.
14         Thomopoulos is an advisor and a member of the National Hellenic Society and
15         holds a degree in Foreign Service from Georgetown University and sat on its Board
           of Directors from 1978 to 1988.  Mr. Thomopoulos was chosen as a director of the
16         Company based on his entertainment industry experience.

17         62.      Upon information and belief, defendant Thomopoulos is a citizen of California.

18                   **DUTIES OF THE INDIVIDUAL DEFENDANTS**

19         63.      By reason of their positions as officers and/or directors of the Company and

20  because of their ability to control the corporate affairs and business of the Company, the Individual

21
    Defendants owed the Company and its stockholders fiduciary obligations of good faith, trust,
22
    loyalty, and due care, and were and are required to use their best efforts to control and manage the
23
24  Company in a fair, just, honest, and equitable manner.  The Individual Defendants were and are

25  required to act in furtherance of the best interests of the Company and its stockholders so as to

26  benefit all stockholders equally and not in furtherance of their personal interest or benefit.  Each

27
    director and officer of the Company owes to the Company and its stockholders the fiduciary duty
28

                                      16

to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

64.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

65.    In addition, as officers and/or directors of a publicly held company, the Individual Defendants have a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, management, projections, and forecasts so that the market price of the Company's stock will be based on truthful and accurate information.

66.    To discharge their duties, the officers and directors of Genius were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.  By virtue of such duties, the officers and directors of Genius were required to, among other things:

a.    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

b.    conduct the affairs of the Company in a lawful, efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c.    properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

d.      remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

e.      ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

67.      Each of the Individual Defendants, as an executive officer and/or director, owed to the Company and to its stockholders the fiduciary duties of loyalty, good faith, and candor in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its stockholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

68.      According to the Company's Corporate Governance Guidelines, the Board members are required to "to perform his or her duties in good faith, in a manner he or she reasonably believes to be in the best interests of the Company and its stockholders, and with such

18

care, including reasonable inquiry, skill and diligence, as a person of ordinary prudence would use under similar circumstances."

69.     The Company also maintains a Code of Business Conduct and Ethics and Whistleblower Policy (the "Code of Conduct"). The Code of Conduct sets forth legal and ethical standards of conduct for directors, officers, employees, and consultants of Genius and its subsidiaries.

70.     According to the Code of Conduct, the employees and directors of Genius are responsible for helping Genius maintain its good reputation and the trust and confidence of its stockholders, its employees, the public, and those with whom Genius does business.

71.     Pursuant to the Code of Conduct:

**C. Accurate Records and Reporting**

Under law, the company is required to keep books, records and accounts that accurately and fairly reflect all transactions, dispositions of assets and other events that are the subject of specific regulatory record keeping requirements, including generally accepted accounting principles and other applicable rules, regulations and criteria for preparing financial statements and for preparing periodic reports filed with the Securities and Exchange Commission. All company reports, accounting records, sales reports, expense accounts, invoices, purchase orders, and other documents must accurately and clearly represent the relevant facts and the true nature of transactions. Reports and other documents should state all material facts of a transaction and not omit any information that would be relevant in interpreting such report or document. Under no circumstance may there be any unrecorded liability or fund of the company, regardless of the purposes for which the liability or fund may have been intended, or any improper or inaccurate entry knowingly made on the books or records of the company. No payment on behalf of the company may be approved or made with the intention, understanding or awareness that any part of the payment is to be used for any purpose other than that described by the documentation supporting the payment. In addition, intentional accounting misclassifications (e.g., expense versus capital) and improper acceleration or deferral of expenses or revenues are unacceptable reporting practices that are expressly prohibited.

*     *     *

Responsibility for compliance with these internal controls and disclosure controls

19

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

and procedures rests not solely with the company's accounting personnel, but with all associates involved in approving transactions, supplying documentation for transactions, and recording, processing, summarizing and reporting of transactions and other information required by periodic reports filed with the Securities and Exchange Commission.  Because the integrity of the company's external reports to shareholders and the Securities and Exchange Commission depends on the integrity of the company's internal reports and record-keeping, all associates must adhere to the highest standards of care with respect to our internal records and reporting.  The company is committed to full, fair, accurate, timely, and understandable disclosure in the periodic reports required to be filed by it with the Securities and Exchange Commission, and it expects each associate to work diligently towards that goal.

72.     In addition, the Company's Audit Committee is specifically tasked with the Board's oversight responsibilities.  The conduct of the Audit Committee is governed by the Audit Committee Charter (the "Charter").

73.     Pursuant to the Charter:

**Statement of Purpose**

The Committee shall provide assistance to the Board of Directors in its oversight, independence and qualification of the Corporation's independent registered auditors and in fulfilling their responsibility to the shareholders, potential shareholders and investment community relating to corporate accounting, reporting practices of the Corporation, the quality and integrity of the financial reports of the Corporation and the Corporation's compliance with legal and regulatory requirements.  In so doing, it is the responsibility of the Committee to maintain free and open means of communication between the directors, the independent auditors and the financial management to the Corporation.

**Responsibilities**

In carrying out its responsibilities, the Committee believes its policies and procedures should remain flexible, in order to best react to changing conditions and to ensure to the directors and shareholders that the corporate accounting and reporting practices of the Corporation are in accordance with all requirements and are of the highest quality.

In carrying out these responsibilities, the Committee will:

• Serve as an independent and objective party to monitor the Corporation's financial reporting process and internal control system and complaints or concerns relating thereto.

• To select and retain an independent registered public accounting firm to act as the Corporation's independent auditors for the purpose of auditing the Corporation's annual financial statements, books, records, accounts and internal controls over financial reporting, subject to ratification by the Company's stockholders of the selection of the independent auditors.

• To recommend, for shareholder approval, the independent auditor to examine the Corporation's accounts, controls and financial statements.  The Committee shall have the sole authority and responsibility to select, evaluate and if necessary, replace the independent auditor.  The Committee shall have the sole authority to approve all audit engagement fees and terms and the Committee, or a member of the Committee, must pre-approve any nonaudit service provided to the Corporation by the Corporation's independent auditor.

• Meet with the independent auditors and financial management of the Corporation to review the scope of the proposed audit for the current year and the audit procedures to be utilized, and at the conclusion thereof review such audit, including any comments or recommendations of the independent auditors.

• Obtain and review at least annually, a formal written report from the independent auditor setting forth its internal quality–control procedures; material issues raised in the prior five years by its internal quality–control reviews and their resolution. The Committee will review at least annually all relationships between the independent auditor and the Corporation.

• Ensure that the lead audit partner assigned by the independent auditor as well as the audit partner responsible for reviewing the audit of the corporation's financial statements shall be changed at least every five years.

• Review and appraise the audit efforts of independent auditors of the Corporation and, where appropriate, recommend the replacement of the independent accountants.

• Consider and approve, if appropriate, major changes to the Corporation's accounting principles and practices as suggested by the independent auditors or management.

• Establish regular and separate systems of reporting to the Committee by management and the independent auditors regarding any significant judgements made in management's preparation of the financial statements and the view of each as to appropriateness of such judgments and additional items as required under the Sarbanes-Oxley Act including critical accounting policies.

• Review with the independent auditors and financial accounting personnel, the adequacy and effectiveness of the accounting and financial controls of the Corporation, and elicit any recommendations for the improvement of such internal

21

control procedures or particular areas where new or more detailed controls or procedures are desirable.  Particular emphasis should be given to the adequacy of such internal controls to assess and manage financial risk exposure and to expose any payments, transactions or procedures that might be deemed illegal or otherwise improper.

• Review and approve the internal corporate audit staff functions, including (i) purpose, authority and organizational reporting lines; (ii) annual audit plan, budget and staffing; (iii) concurrence in the appointment, compensation and rotation of the internal audit management function; and (iv) results of internal audits.

• Review the financial statements contained in the annual report and quarterly report to shareholders with management and the independent auditors to determine that the independent auditors are satisfied with the disclosure and content of the financial statements to be presented to the shareholders.  Any changes in accounting principles should be reviewed.

• Prepare and publish an annual Committee report in the proxy statement of the Corporation.

• Review with management of the Corporation any financial information, earnings press releases and earnings guidance filed with the Securities and Exchange Commission or disseminated to the public, including any certification, report, opinion or review rendered by the independent auditors.

• Provide sufficient opportunity for the independent auditors to meet with the members of the Committee without members of management present.  Among the items to be discussed in these meetings are the independent auditors' evaluation of the Corporation's financial, accounting and auditing personnel, and the cooperation that the independent auditors received during the course of the audit.

• Establish procedures for receiving and treating complaints received by the Corporation regarding accounting, internal accounting controls and auditing matters, and the confidential anonymous submission by employees of concerns regarding questionable accounting or auditing matters.

• Submit the minutes of all meetings of the Committee to, or discuss the matters discussed at each Committee meeting with, the board of directors.

• Investigate any matter brought to its attention within the scope of its duties, with the power to retain outside advisors for this purpose if, in its judgment, that is appropriate.

• Review, approve and oversee any transaction between the Corporation and any "related person," as defined by the Securities and Exchange Commission in its rules, on an ongoing basis and to develop policies and procedures for the

Committee's approval of related party transactions.

• Retain and obtain, in its sole discretion, the advice and assistance of independent outside counsel and such other advisors as deemed necessary to fulfill the Committee's duties and responsibilities, and to set the compensation of, oversee the work of and evaluate the funding required to cover any outside counsel and other advisors.

74.    In violation of the Charter, and their general duties as members of the Audit Committee, defendants Hallren, Klein, and Thomopoulos (the "Audit Committee Defendants"), conducted little, if any, oversight of the Company's internal controls or the Company's compliance with legal and regulatory requirements, resulting in materially false and misleading statements regarding the Company's business, operational, and compliance policies, and consciously disregarded their duties to monitor such controls over reporting.  The Audit Committee Defendants' complete failure to perform their duties in good faith resulted in false misrepresentations to the SEC, the investing public, and the Company's stockholders.

75.    Each of the Individual Defendants further owed to Genius and its stockholders the duty of loyalty, which requires that each favor Genius's interest and that of its stockholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain a personal advantage.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

76.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants caused the Company to conceal the true facts as alleged herein.  The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

77.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual

23
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

78.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who are directors of Genius was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

79.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

////

////

////

////

////

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**SUBSTANTIVE ALLEGATIONS**

**Background**

80.     Genius is incorporated in Nevada and is headquartered in California.  Genius's business focuses on content and brand management along with the creation and licensing of multimedia content for toddlers to tweens.

81.     Genius's products are distributed across numerous platforms, including Comcast's Xfinity on Demand, AppletTV, Roku, Amazon Fire, YouTube, Amazon Prime, Cox, Dish, Sling, Zumo, and Connected TV.  The Company's entertainment property portfolio includes products such as Rainbow Ranger for Nick Jr., Llama Llama for Netflix, Baby Genius, Thomas Edison's Secret Lab, Warren Buffet's Secret Millionaire's Club, and the upcoming Stan Lee's Superhero Kindergarten.

82.     Originally founded in 2006, Genius operated as a private company until it went public in 2009.  Upon reincorporation in Nevada in 2011, the Company, which was formerly known as Pacific Entertainment Corporation changed its corporate name to Genius.  In 2013, the Company acquired through a merger the business and operation of multimedia and entertainment company A Squared Entertainment LLC ("A Squared").

83.     Since going public in 2009, Genius's stock has traded at relatively low prices, becoming what is known as a "penny stock" by mid-July 2019, when Genius's stock traded for less than $1.00 per share.  The Company's shares remained below $1.00 from July 23, 2019 through the end of the year.  Accordingly, on September 4, 2019, Genius received a notification letter from the NASDAQ informing the Company that it had 180 calendar days, or until March 2, 2020, to regain compliance.

84.     Given that NASDAQ's continued listing requirements mandate that a company's share price remain equal to or greater than $1.00 per share, during this period, Genius was at risk

25

of being delisted from the NASDAQ.  On March 5, 2020, the Company disclosed in a Form 8-K filed with the SEC that "[i]f the Company does not meet the minimum bid requirement during the additional 180-day grace period, Nasdaq will provide written notification to the Company that its common stock will be subject to delisting."

85.     Further, the 2019 10-K stated that Genius incurred an operating loss each fiscal quarter since its inception.  The 2019 10-K also stated that while the Company's revenue had increased from $999,452 in 2018 to $5,907,899 in 2019, the Company incurred a net loss of nearly $2.48 million more in 2019 than it did in 2018 due to skyrocketing costs and expenses.

86.     In relevant part, the Company's 2019 10-K states the following:

We will need to generate additional revenue and/or reduce costs to achieve profitability.  We are beginning to generate revenues derived from our existing properties, properties in production, and new brands being introduced into the marketplace.  However, the ability to sustain these revenues and generate significant additional revenues or achieve profitability will depend upon numerous factors some of which are outside of our control.

\*\*\*

**We will need additional financing to continue our operations.  If we are unable to obtain additional financing on acceptable terms, we will need to curtail or cease our development plans and operations.**

As of December 31, 2019, we had approximately $305,000 of available cash, cash equivalents, and restricted cash.  Following various financings during the first quarter of 2020, as of March 28, 2020, we had approximately $2.8 million of cash and cash equivalents.  Additional funds may be required to fund operations and repay our outstanding debt which could be raised through the issuance of equity securities and/or debt financing.  There is no assurance that any type of financing on terms acceptable to us will be available or will otherwise occur.  Debt financing must be repaid regardless of whether we generate revenues or cash flows from operations and may be secured by substantially all of our assets.  Any equity financing or debt financing that requires the issuance of warrants or other equity securities to the lender would cause the percentage ownership by our current stockholders to be diluted, which dilution may be substantial.  Also, any additional equity securities issued may have rights, preferences or privileges senior to those of existing stockholders.  If we obtain stockholder approval, any equity financing at a price below the then current conversion price of our March 2020 Secured Convertible Notes or the exercise price of the March 2020 Warrants will result in

an adjustment to the conversion price or exercise price applicable to such securities, resulting in the potential issuance of additional shares of our common stock upon the conversion or exercise of such securities, which would further dilute our other stockholders.

**If we are not able to obtain sufficient capital, we may then be forced to limit the scope of our operations.**

We expect that as our business continues to evolve, we will need additional working capital.  If adequate additional debt and/or equity financing is not available on reasonable terms or at all, we may not be able to continue to expand our business, and we will have to modify our business plans accordingly.  These factors could have a material adverse effect on our future operating results and our financial condition.

If we reach a point where we are unable to raise needed additional funds to continue as a going concern, we could be forced to cease our activities and dissolve our company.  In such an event, we will need to satisfy various creditors and other claimants, severance, lease termination and other dissolution-related obligations.

87.     As outlined in the Company's quarterly report on Form 10-Q for the fiscal quarter ended March 31, 2020 (the "1Q2020 10-Q"), Genius maintained low liquidity as its liabilities far outweighed its cash assets, resulting in negative working capital.

88.     Around this time and unbeknownst to shareholders, Genius began to work with a third-party stock promoter, PennyStocks, to begin issuing favorable reports about the Company. According to its website, PennyStocks only publishes favorable information because it is "compensated to only publish favorable information."  It also states that not all information is sent to investors at the same time, and that "[i]f the trading volume and price of a Profile Issuer's securities increases after the Information is provided to an earlier group of investors, then subsequent investors will pay inflated prices for any securities of the Profiled Issuers that they purchase."  The website also explained that "[t]his will likely result in the Profiled Issuers having trading losses."

**The Company Conducts a Series of Stock Offerings as the
Individual Defendants Issue False and Misleading Statements to the Public**

89.     Taking into account the Company's lack of working capital, the danger of losing the Company's NASDAQ listing, and the onset of rising costs and expenses, as detailed in the Company's 1Q2020 10-Q, the Individual Defendants endeavored to conduct a series of offerings of Company stock and convertible notes during the Relevant Period in order to secure the funds the Company needed.  At the same time, the Individual Defendants made numerous statements to the investing public that grossly exaggerated the Company's business outlook and growth prospects, in order to artificially increase the price of the Company's stock.

90.     The Company entered into an agreement to raise $11 million on March 17, 2020 through the issuance of Senior Secured Convertible Notes (the "Notes").

91.     The Individual Defendants caused the Company to file a Form 8-K on March 23, 2020 (the "March 23 Form 8-K") and one day later, on March 24, 2020, a prospectus supplement on Form 424B5 (the "March 24 Form 424B5") (collectively, the "March 24 Offering Documents") in connection with a direct offering of 4,000,000 shares of the Company's common stock to long-standing investors at $0.25 per share, approximately $0.06 below its market value at the time of the offering.  The total gross proceeds from the offering equaled approximately $1 million.  The March 24 Offering Documents explained that the Company intended to use the net proceeds for its "general corporate purposes."

92.     The Individual Defendants caused the Company to file a prospectus supplement on May 7, 2020, on Form 424B5 (the "May 7 Form 424B5") and a current report on Form 8-K (the "May 7 Form 8-K") (collectively, the "May 7 Offering Documents") with the SEC in connection with an additional direct offering of 8,000,000 shares of the Company's common stock to long-standing investors at $0.35 per shares, approximately $0.13 below its market value at the

time of the offering. The total gross proceeds from the offering equaled approximately $2.8 million. The May 7 Offering Documents explained that the Company intended to use the net proceeds for "working capital and general corporate purposes including to fund production of additional episodes of its series, Rainbow Rangers, and to grow its newly-announced digital network for children and families, Kartoon Channel!."

93. The Individual Defendants also caused the Company to publish a press release on May 7, 2020 titled "Genius Brands International Announces $2.8 Million Registered Direct Offering" (the "May 7 Press Release") announcing that it had entered into a securities purchase agreement with "certain long-standing investors." The May 7 Press Release reiterated, in pertinent part, that the offering was for the purchase and sale of 8 million shares of its common stock at a purchase price of $0.35 per share in a registered direct offering, resulting in total gross $2.8 million.

94. In relevant part, the May 7 Press Release continues to state:

> The net proceeds of the financing will be used for working capital and general corporate purposes. In addition, Genius Brands intends to use the proceeds to fund production of additional episodes of its series, *Rainbow Rangers*, which will debut on Nick Jr. in conjunction with the launch of the toy line from Mattel, Inc. at Walmart stores Q3 2020. The Company will also apply the financing to grow its newly- announced digital network for children and families, *Kartoon Channel!*, which will launch in June 2020 with availability in over 100M U.S. television households.

95. On May 11, 2020, only days after the May 7 Offering Documents, the Individual Defendants caused the Company to file a prospectus supplement on Form 424B5 with the SEC (the "May 11 Form 424B5") in connection with a direct offering of 12,000,000 shares of the Company's common stock to long-standing investors of $0.45 per share, approximately $0.38 below its market value at the time of the offering. The total gross proceeds from the offering equaled approximately $5.4 million. The May 11 Form 424B5 explained that the Company intended to use the net proceeds for its "operations and for other general corporate purposes,

29
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  including, but not limited to, the development, production, and distribution of animated content

2  and associated licensed merchandise, general working capital and possible future acquisitions."

3  96.    On March 13, 2020, the Individual Defendants caused the Company to publish a

4  shareholder letter (the "May 13 Shareholder Letter") in which defendant Heyward announced the

5  following, in relevant part:

6
7      It has been a busy week and an exciting week for Genius Brands, and with all of
       this news, there was a surge of activity buying Genius Brands shares, and the stock
8      price rose as a result.   Based on that, we did a cash raise to provide adequate
       '*gunpowder*' to fund new episodes of RAINBOW RANGERS on air, to coincide
9      when toys go on shelf at Walmart in August, as well as have funds to ensure first-
       class build-out of *Kartoon Channel!* when we go live on June 15, including not
10     only content acquisitions and marketing, but on-air branding--bumpers, graphics,
11     and musical stings, etc.

12  97.    The Individual Defendants caused the Company to its 1Q2020 10-Q, which set

13  forth the Company's financial troubles for the first fiscal quarter ended March 31, 2020, stating,

14  in pertinent part, that, "Licensing and Royalty revenue decreased $146,821, or 42%" and

15  "Television & Home Entertainment revenue decreased $797,890, or 94%, primarily due to the

16
17  revenue generated from the delivery of *Rainbow Rangers* to the Viacom Media Network in January

18  2019 without comparable revenue in 2020."

19  98.    The 1Q2020 10-Q also stated that, as of March 31, 2020, the Company had

20
21  $2,760,048 in cash and cash equivalents and $19,290,901 in liabilities, resulting in negative

22  working capital of $9,198,824, compared to a negative working capital of only $3,650,136 as of

23  December 31, 2019.

24  99.    Also on May 18, 2020, the Company filed a current report on Form 8-K (the "May

25  18 Form 8-K") and one day later, May 19, 2020, filed a prospectus supplement on Form 424B5

26  (the "May 19 Form 424B5") (collectively, the "May 19 Offering Documents") with the SEC in

27  connection with a direct offering of 7,500,000 shares of the Company's common stock to long-

28

standing investors at $1.20 per share, approximately $0.30 below its market value at the time of the offering.  The total gross proceeds from the offering equaled approximately $9 million.  The May 19 Offering Documents explained that that Company intended to use the net proceeds to "grow its newly-announced digital network for children, Kartoon Channel!, to fund production of additional episodes of its series Rainbow Rangers, and for the repayment of certain outstanding debt, and for working capital."

100.     On May 28, 2020, the Individual Defendants caused the Company to file a current report on Form 8-K (the "May 28 Form 8-K") and the next day, May 29, 2020, filed a prospectus supplement on Form 424B5 (the "May 29 Form 424B5") (collectively, the "May 29 Offering Documents") with the SEC in connection with another direct offering of 20,000 shares of the Company's common stock to long-standing investors of $1.50 per share, approximately $0.33 below its market value at the time of the offering.  The total gross proceeds from the offering equaled approximately $30 million.  The May 29 Offering Documents stated that the Company intended to use the net proceeds to "repay certain outstanding debt and for working capital and general corporate purposes, including to fund production of additional episodes of our series, Rainbow Rangers, and to grow our newly-announced digital network for children and families, Kartoon Channel!."

101.     The Individual Defendants caused the Company to issue a statement on June 8, 2020 via a press release titled "Genius Brands International Responds to Misleading Short Seller Criticisms" (the "June 8 Press Release").  The June 8 Press Release, where defendant Heyward responded to short seller criticisms contained in the Hindenburg Report, stated, in relevant part:

> On a personal note, *I have not sold a single share, and in fact, have materially increased my holdings in the Company in the last two years*.  We take the views of all our investors seriously, and we and our board are committed to maintaining the highest standards of corporate governance and transparency.

102.    On June 11, 2021, only a few days before the launch of Genius's Kartoon Channel!, the Individual Defendants caused the Company to file a prospectus on Form 424B5 (the "June 11 Form 424B5") registering over 60 million shares of its common stock for resale by a group of "selling shareholders" at a listed price of $4.51 per share.

103.    On the same day, June 11, 2020, the Motley Fool published an article titled "3 Things Genius Brands Stock Bulls Need to Happen Soon"[2] where it laid out what investors would be watching for to justify the Company's inflated valuation.  The article stated the following, in relevant part:

**2. Genius Brands' selling shareholders need to cancel their stock offering.**

As often happens when a stock price soars, early investors in Genius Brands are looking for the exits.  **If Genius really wants to avoid the appearance of a pump-and-dump scheme, then it should urge those selling shareholders to reconsider**.

Regardless of the true motivation behind the stock offering, the optics look terrible. During May, Genius Brands sold stock to "certain long standing investors" at prices ranging from $0.35 to $1.50 per share, raising gross proceeds of about $47.25 million.   That followed the issuance of secured convertible notes and warrants in March to certain accredited investors, including Heyward.  The warrants gave investors the right to buy stock at $0.21 per share, and now Genius Brands is registering the shares to allow those investors to sell the stock acquired through the warrants at much higher current prices.

To be fair, Heyward isn't listed as a selling shareholder, and the prospectus for the sale doesn't list the Genius Brands CEO as being affiliated with any of the limited partnerships and other investment groups that are selling shares. Nevertheless, with expectations of selling more than 60 million shares, the desire to cash out quick is evident -- and actions speak louder than the words of those trying to reassure current shareholders not to draw inferences from the move.

104.    On June 19, 2020, only 11 days after defendant Heyward had assured investors that he had not "sold a single share," Heyward sold 460,574 shares at $2.94 per share for gross proceeds of approximately $1.3 million.

---

[2]    *Available at* https://www.fool.com/investing/2020/06/1/3-things-genius-brands-stock-bulls-need-to-happen.aspx (last visited August 28, 2020).

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

105.     The Company issued a press release on June 23, 2020, announcing that it had come to an agreement with all of its existing senior secured convertible noteholders to have the noteholders pre-pay their Notes for an aggregate of $4 million, three months early and then have the noteholders convert all of their $13.75 million of debt to equity.

106.     The Individual Defendants were aware that their statements were false, misleading, exaggerated, and overly optimistic.  However, the Individual Defendants continued to knowingly circulate false statements and omissions of material fact regarding the Company's products, assets, and growth potential to artificially inflate the price so as to profit and avoid Genius's impending burial in insurmountable debt.  Further, the Individual Defendants have failed to correct or clarify their false and misleading statements and omissions of material fact.

**Materially False and Misleading Statements**

107.     On March 17, 2020, the Individual Defendants caused the Company to issue a press release titled "Nickelodeon Expands Daily Broadcasts of Genius Brand International's Hit Preschool Series, Rainbow Rangers" (the "March 17 Press Release") announcing that Nickelodeon had raised the broadcasts of the Company's preschool series, Rainbow Rangers, to 26 airings per week.  The March 17 Press Release states the following, in relevant part:

> **Nick Jr. now airs *Rainbow Rangers* Monday – Friday, four airings per day, and six airings on the weekends.   The animated action- adventure series premiered on Nick Jr. in November 2018 with five airings per week and has consistently achieved high ratings with its target demo of Girls 2 – 5-years-old.   The additional airings of *Rainbow Rangers,* which  represents a five-fold   increase  (400+%),** are complimented by content available via video on demand platforms and the brand's robust YouTube channel where viewers have consumed over 22.5 million minutes of *Rainbow Rangers'* content in the last year.

(Emphasis added.)

108.     On March 20, 2020, the Individual Defendants caused the Company to publish a press release (the "March 20 Press Release") stating, in relevant part, that "*Cartoons endure.* We

33

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

announced Tuesday that *Rainbow Rangers* is now up to 26 broadcasts a week on Nick Jr.!!!"  On a conference call on the same day, March 20, 2020, defendant Heyward reiterated the above referenced statements.

109.    On March 23, 2020, the Individual Defendants caused the Company to publish a press release (the "March 23 Press Release") stating, in relevant part, that "[Rainbow Rangers] premiered in the U.S. in November 2018 on Nickelodeon's **Nick Jr.** and has since achieved a 400+% increase in airtime with *Rainbow Rangers* now airing 26x each week."

110.    On March 24, 2020, in connection with the Company's direct offering of shares of its common stock, the Individual Defendants caused the Company to file the March 24 Offering Documents with the SEC.  The March 24 Offering Documents stated, in relevant part:

*Content in Production*

*Rainbow Rangers Season 2*: From Shane Morris, the writer of Frozen, and Rob Minkoff, the director of The Lion King, Rainbow Rangers is an animated series about the adventures of seven magical girls from Kaleidoscopia, a fantastic land on the other side of the rainbow.  The Rangers serve as Earth's guardians and first-responders.  When there's trouble for the people or animals of the Earth, the Rangers ride a rainbow across the sky to save the day.  We have partnered with Mattel Inc.'s Fisher Price Toys as the master toy partner for the series, and Viacom's Nick Jr. has licensed the series for broadcast in the US. Numerous international broadcast agreements have been signed and several more are currently being negotiated in various territories.  Viacom has ordered a second season of the series consisting of 26 halfhour episodes that are currently in production, the first of which have been delivered.

\*\*\*

*Already Released Content*

*Rainbow Rangers*: The series premiered on Nick Jr. in November 2018 and we completed 26 half hour episodes in February 2019.  The series was created by Shane Morris, the co-writer of Frozen, and Rob Minkoff, the director of The Lion King, Rainbow Rangers is an animated series about the adventures of seven magical girls from Kaleidoscopia, a fantastic land on the other side of the rainbow.  The Rangers serve as Earth's guardians and first-responders.  When there's trouble for the people or animals of the Earth, the Rangers ride a rainbow across the sky to save the day.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

A global licensing program is in place and the first products will be introduced to the market in second quarter of 2019.

111.    The March 24 Offering Documents only provided a generic update of Rainbow Rangers, the Company's flagship product, but failed to correct or clarify the statements regarding increased broadcasting or the status of negotiations with Nickelodeon pertaining to the renewal of the show for a third season, all of which were made in the March 17 Press Release.

112.    On March 30, 2020, the Individual Defendants caused the Company to file its 2019 10-K. The 2019 10-K was signed by defendants Heyward, Denton, Davis, Hallren, Klein, Loesch, Segall, and Thomopoulos, and contained Sarbanes-Oxley Act of 2002 ("SOX") certifications signed by defendants Heyward and Denton attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

113.    Regarding the Company's Internal controls, the 2019 10-K stated the following:

Our management assessed the effectiveness of our internal control over financial reporting as of December 31, 2019. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in *Internal Control – Integrated Framework (2013 Framework)*.

**Based on this assessment, our management, with the participation of our Chief Executive Officer (principal executive officer) and our Chief Financial Officer (principal financial and accounting officer), has concluded that, as of December 31, 2019, our internal control over financial reporting were effective based on those criteria.**

**Evaluation of Disclosure Controls and Procedures**

We carried out an evaluation, under the supervision and with the participation of our management, including our chief executive officer and chief financial officer, of the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the ''Exchange Act''). Disclosure controls and procedures include, without limitation, controls and procedures that are designed to ensure that information required to be disclosed by an issuer in the reports that it files or submits under the Exchange Act is accumulated and

1
2
3
4
5

communicated to the issuer's management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.  Based upon our evaluation, our chief executive officer and chief financial officer concluded that our disclosure controls and procedures were effective for the year ended December 31, 2019 in ensuring that information that we are required to disclose in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission rules and forms.

6
7

**Changes in Internal Control over Financial Reporting**

8
9

There were no changes in our internal control over financial reporting that occurred during the fourth quarter of our last fiscal year that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

10

(Emphasis added in bold and not italics, except headings.)

11
12
13
14
15

114.    On March 31, 2020, the Individual Defendants caused the Company to publish a press release (the "March 31 Press Release") stating, in relevant part, that Rainbow Rangers "airs on Nick Jr. in the U.S. Monday – Friday with four airings per day, and six airings on the weekends…"

16
17
18
19
20
21
22

115.    On April 20, 2020, the Individual Defendants caused the Company to release a press release (the "April 20 Press Release") to shareholders in which Heyward stated that launching Stan Lee's Superhero Kindergarten on Amazon and Alibaba was "[p]lutonium in a bottle" and affirmed that Genius is "positioned to explode" in 2020.  Defendant Heyward reiterated the above referenced statements on a conference call later that day (the "April 20 Conference Call").

23
24
25
26

116.    On April 14, 2020, the Individual Defendants caused the Company to file its 2020 Proxy Statement with the SEC.  The 2020 Proxy Statement was solicited by defendants Heyward, Davis, Hallren, Klein, Loesch, Segall, and Thomopoulos pursuant to Section 14(a) of the Exchange

27
28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Act, which contained material misstatements and omissions.[3]  The 2020 Proxy Statement stated, with respect to the Company's Code of Conduct, that, "[w]e have adopted a Corporate Code of Conduct and Ethics and Whistleblower Policy that applies to all of our officers, directors and employees."   Despite assertions to the contrary, the 2020 Proxy Statement was false and misleading because the Code of Conduct was not followed, as evidenced by the multitude of false and misleading statements alleged herein, and the Individual Defendants' failures to report violation of the Code of Conduct.

117.      In addition, the 2020 Proxy Statement also called for shareholder approval of, among other things:  (1) the approval, for purposes of complying with Nasdaq Listing Rule 5635(d), of the issuance of shares of common stock upon conversion, exercise, exchange or otherwise pursuant to the terms of a securities purchase agreement dated March 11, 2020, and the convertible notes and warrants to purchase common stock and the warrants issued to the placement agent (the "Issuance Proposal 1"); (2) approval, for purposes of complying with Nasdaq Listing Rule 5635(c), the issuance of shares of common stock upon conversion, exercise, exchange or otherwise to defendant Heyward pursuant to the terms of a securities purchase agreement dated March 11, 2020, and the related convertible notes and warrants (the "Issuance Proposal 2"); and (3) approval of a proposed amendment to the Company's Articles of Incorporation to increase the authorized number of shares of Genius's common stock from 233,333,334 to 650,000,000 (the "Amendment Proposal").

---

[3]  Plaintiff's allegations with respect to the misleading statements in the 2020 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

118.     Also, the 2020 Proxy Statement was also misleading because it failed to disclose, *inter alia*, that: (1) Rainbow Rangers was airing on Nickelodeon only nine times per week, rather than 26 times as Genius had previously represented, and at unfavorable time slots; (2) Kartoon Channel! would be available to Amazon Prime members only as an add-on channel for an additional subscription fee; (3) Kartoon Channel! platform was not as robust of an offering as the Individual Defendants purported; (4) the commercial viability of the Company was overstated in light of the true accuracy of the Company's products and assets; and (5) the Company failed to maintain internal controls.

119.     On May 7, 2020 and May 11, 2020, the Company filed the May 7 Offering Documents and May 11 Offering Documents, respectively, with the SEC in connection with the Company's direct offering of shares of its common stock.  The May 7 Offering Documents and May 11 Offering Documents stated, in relevant part:

*Content in* Production

*Rainbow Rangers Season 2*: From Shane Morris, the writer of *Frozen*, and Rob Minkoff, the director of *The Lion King*, *Rainbow Rangers* is an animated series about the adventures of seven magical girls from Kaleidoscopia, a fantastic land on the other side of the rainbow.  The Rangers serve as Earth's guardians and first-responders.  When there's trouble for the people or animals of the Earth, the Rangers ride a rainbow across the sky to save the day.  We have partnered with Mattel Inc.'s Fisher Price Toys as the master toy partner for the series, and Viacom's Nick Jr. has licensed the series for broadcast in the US. Numerous international broadcast agreements have been signed and several more are currently being negotiated in various territories.  Viacom has ordered a second season of the series consisting of 26 half- hour episodes that are currently in production, the first of which have been delivered.

*** 

*Already Released* Content

*Rainbow Rangers*: The series premiered on Nick Jr. in November 2018 and we completed 26 half hour episodes in February 2019.  The series was created by Shane Morris, the co-writer of *Frozen*, and Rob Minkoff, the director of *The Lion King*, *Rainbow Rangers* is an animated series about the adventures of seven magical girls

from Kaleidoscopia, a fantastic land on the other side of the rainbow. The Rangers serve as Earth's guardians and first-responders. When there's trouble for the people or animals of the Earth, the Rangers ride a rainbow across the sky to save the day. A global licensing program is in place and the first products will be introduced to the market in second quarter of 2019.

120.     The May 7 Offering Documents and May 11 Offering Documents failed to correct or clarify statements made in the March 17 Press Release, providing only a generic update of Rainbow Rangers, the Company's flagship product. The incorrect or misleading statements regarding increased broadcasting or the status of negotiations with Nickelodeon pertaining to the renewal of Rainbow Rangers for a third season were not addressed.

121.     Also, on May 13, 2020, in a separate press release (the "May 13 Press Release"), defendant Heyward stated, in relevant part, that he is "pleased to report that Genius Brands is in a stronger position today than ever before in its history" and that the Company sees "robust and accelerated revenue growth coming forth" in the animated content arena.

122.     Genius publicized Kartoon Channel! in the Company's May 13 Shareholder Letter and stated, in relevant part:

> *Kartoon Channel!* is what we like to call a 'Netflix for kids', except it is free. There is no subscription fee.   It is fully ad-supported. It is a pure cartoon play, with no 'natural predators', and what one of our board members described as an *"economic vaccine for COVID-19."*

123.     The May 13 Press Release, in relevant part, stated:

> In addition, *Kartoon Channel!* has acquired a large (almost 4,000 episodes!) and carefully curated number of animated programs ranging from *Archie's Weird Mysteries* to *Minecraft; Journey to the End*, to *Gummy Bear and Friends*, that are safe, fun, and without violence, negative stereotypes, or objectionable language.

> Though we can't compare ourselves to linear cable channels, it should be  noted that when Disney Channel, Nickelodeon, and Cartoon Network all went on the air, they started with a 10 million order of magnitude subscribers.    *Kartoon Channel!* is an 'on-demand' channel which means like Netflix, we offer a *menu* of offerings and the *viewer* then determines which program he or she chooses to watch. Having said the above, *when Kartoon Channel!* goes live on June 15, it will be available in over 100 million U.S. television households, and over 200 million

mobile devices. All free to the viewer. All ad-supported (with the exception of a small tranche of platforms, where the viewer can elect an SVOD option with no commercials). If you have Amazon Prime, you can see it. If you have Apple TV, you can see it. If you have Comcast, Cox, or DISH and Sling TV, you can see it. I cannot recall any children's channel ever starting with such complete distribution, on Day 1, *and let alone, at a time when the demand could not possibly be higher.*

124.     Defendants Heyward and Denton signed the 1Q2020 10-Q along with certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act as well as the SOX attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

125.     With regard to the Company's internal controls, the 1Q2020 10-Q stated the following:

**Changes in Internal Control over Financial Reporting**

There were no changes in our internal control over financial reporting that occurred during the quarter ended March 31, 2020, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

126.     The Individual Defendants caused the Company to file the May 19 Offering Documents with the SEC in connection with the Company's direct offering of shares of its common stock on or about May 19, 2020. In pertinent part, the May 19 Offering Documents stated:

*Content in* Production

*Rainbow Rangers Season 2*: From Shane Morris, the writer of *Frozen*, and Rob Minkoff, the director of *The Lion King*, *Rainbow Rangers* is an animated series about the adventures of seven magical girls from Kaleidoscopia, a fantastic land on the other side of the rainbow. The Rangers serve as Earth's guardians and first-responders. When there's trouble for the people or animals of the Earth, the Rangers ride a rainbow across the sky to save the day. We have partnered with Mattel Inc.'s Fisher Price Toys as the master toy partner for the series, and Viacom's Nick Jr. has licensed the series for broadcast in the US. Numerous

international broadcast agreements have been signed and several more are currently being negotiated in various territories. Viacom has ordered a second season of the series consisting of 26 half-hour episodes that are currently in production, the first of which have been delivered.

***

*Already* Released *Content*

*Rainbow Rangers*: The series premiered on Nick Jr. in November 2018 and we completed 26 half hour episodes in February 2019. The series was created by Shane Morris, the co-writer of *Frozen*, and Rob Minkoff, the director of *The Lion King*, *Rainbow Rangers* is an animated series about the adventures of seven magical girls from Kaleidoscopia, a fantastic land on the other side of the rainbow. The Rangers serve as Earth's guardians and first-responders. When there's trouble for the people or animals of the Earth, the Rangers ride a rainbow across the sky to save the day. A global licensing program is in place and the first products will be introduced to the market in second quarter of 2019.

127.     The May 19 Offering Documents failed to correct or clarify statements made in the March 17 Press Release, providing only a generic update of Rainbow Rangers, the Company's flagship product. The incorrect or misleading statements regarding increased broadcasting or the status of negotiations with Nickelodeon pertaining to the renewal of Rainbow Rangers for a third season were not addressed.

128.     The Individual Defendants caused the Company to file the May 29 Offering Documents with the SEC in connection with the Company's direct offering of shares of its common stock on or about May 29, 2020. In pertinent part, the May 29 Offering Documents stated:

*Content* in Production

*Rainbow Rangers Season 2*: From Shane Morris, the writer of Frozen, and Rob Minkoff, the director of The Lion King, Rainbow Rangers is an animated series about the adventures of seven magical girls from Kaleidoscopia, a fantastic land on the other side of the rainbow. The Rangers serve as Earth's guardians and first-responders. When there's trouble for the people or animals of the Earth, the Rangers ride a rainbow across the sky to save the day. We have partnered with Mattel Inc.'s Fisher Price Toys as the master toy partner for the series, and Viacom's Nick Jr. has licensed the series for broadcast in the US. Numerous

41
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

international broadcast agreements have been signed and several more are currently being negotiated in various territories. Viacom has ordered a second season of the series consisting of 26 half-hour episodes that at are currently in production, the first of which have been delivered.

***

*Already Released Content*

*Rainbow Rangers*: The series premiered on Nick Jr. in November 2018 and we completed 26 half hour episodes in February 2019. The series was created by Shane Morris, the co-writer of *Frozen*, and Rob Minkoff, the director of *The Lion King*, *Rainbow Rangers* is an animated series about the adventures of seven magical girls from Kaleidoscopia, a fantastic land on the other side of the rainbow. The Rangers serve as Earth's guardians and first-responders. When there's trouble for the people or animals of the Earth, the Rangers ride a rainbow across the sky to save the day. A global licensing program is in place and the first products will be introduced to the market in second quarter of 2019.

129.     The May 29 Offering Documents failed to correct or clarify statements made in the March 17 Press Release, providing only a generic update of Rainbow Rangers, the Company's flagship product. The incorrect or misleading statements regarding increased broadcasting or the status of negotiations with Nickelodeon pertaining to the renewal of Rainbow Rangers for a third season were not addressed.

130.     The Company issued a press release on June 5, 2020 in which defendant Heyward commented, in relevant part:

There is a huge appetite for quality children's content that is family- friendly and safe. **No less important, is having it available for free and with no subscription fees** will be compelling now to more and more parents who are looking to provide quality children's entertainment options for their kids. It will be equally important to advertisers, who are increasingly finding fewer channels to reach viewers, in a universe dominated by pay services such as Netflix and Disney+. ***Kartoon Channel!* will be like a 'Netflix for kids, except it is free***.

(Emphasis added.)

131.     Later that day, June 5, 2020, defendant Heyward penned a letter to shareholders, in which he wrote, in pertinent part:

42
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

We previously described Kartoon Channel! like "a Netflix for kids, but its free." Our model is what is called in the industry, AVOD (Advertiser Video On Demand). There is an important significance to this, which in today's children's broadcast world, brings powerful 'wind to our sails'.

1. Netflix and Disney +, viewership is dramatically up, because people are staying at home more.  For a combination of COVID-19 and social reasons, this is even more so for children's TV (e.g. most schools closed, many summer camps have been canceled).

2. Children's Advertiser Demand is UP, while Available Inventory is Scarce. Inventory is scarce, because more and more kids have migrated from linear channels to On Demand channels and much of that On Demand viewing is on Netflix and on Disney+ where there is no advertising.  The result is that advertisers need to scramble to find commercial inventory and 'eyeballs' through which to promote their products, and brands.

Kartoon Channel! will launch with a number of 'programming events', which we believe will be extremely compelling for kids, and which we will announce for you the week before launch.

132.    The statements and omissions referenced in ¶¶ 107-131 herein were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading.  Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public, including: (1) failing to disclose that Rainbow Rangers had not been renewed for a new season on Nick Jr.; (2) failing to disclose that Rainbow Rangers was airing on Nickelodeon only nine times per week, rather than 26 times as Genius had previously represented, and at unfavorable time slots; (3) not disclosing that the economic terms of the deal with Llama Llama, and it did not own the intellectual property for Llama Llama and merely licensed it; (4) failing to disclose that a new wave of selling was likely to pummel the Company's stock as its financial backers sought to lock in profits; (5) posting Stan Lee's Superhero Kindergarten as content on Amazon as self-marketing for the show, which was a far less desirable accomplishment than previously represented; (6) implying Genius had the potential to, like the Walt Disney Company, earn billions of dollars in revenue from the

43

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

box office, even though Genius had been attempting to launch a show with Stan Lee as early as 2011 and had no meaningful commercial success since that time, let alone the "billions of dollars" of success; and (7) failing to disclose how Mr. Lee's passing would impact Genius's purported ability to replicate Disney's success.

**The Truth Gradually Emerges as False and Misleading Statements Continue**

133.     On June 4, 2020, Citron Research ("Citron") questioned the valuation of the Company. Specifically, among other things, Citron posted several critical comments on social media, including a posting that read "$GNUS to $1...fast the lowest form of retail investor. Consider: LTM $GNUS rev $5 mil mkt cap $800 mil compared to leader WildBrain (teletubbies) LTM revenue of $332 million mkt cap $175 mil Not to mention massive dilution at $GNUS. Stock Promotion."

134.     Hindenburg Research published the Hindenburg Report on June 5, 2020, challenging the Company's recently inflated valuation and revealing inaccuracies in the Company's public statements.

135.     Regarding Rainbow Ranger, the Company's flagship show, the Hindenburg Report unveiled, in relevant part, that:

> **Rainbow Rangers—The Company Has Boasted That the Show Is Currently Airing on Nick Jr. True, But It Appears Once Per Day During the Week at 3:49AM EST And Three Times On Sundays. The Show Is Currently Not Yet Slated For a 3rd Season and It Is Unclear Whether It Will Be Renewed.**
>
> Rainbow Rangers is another key show for the company, and in this case Genius *does* own the intellectual property behind the show, making it perhaps the company's most economically relevant property.  It airs on Nick Jr. and has completed 2 seasons to date.
>
> The company made a big deal about its pick-up by Nick Jr. in a January 2019 press release announcing that the show had 455,000 viewers in its premiere:

*"We have just received the Nielsen ratings for our latest premiere episode (Sunday, Jan. 6) of* Rainbow *Rangers on Nick Jr., which generate our highest premiere episode rating to date with 455,000 viewers!*

*The premiere episodes are broadcast on Sundays at 11:30 AM, and the encore episodes are broadcast* Monday *through Friday in the afternoon.*

*And, the strong and growing viewership on Nick Jr. points to an increasing appetite by kids for* Rainbow *Rangers and the coming tsunami of products at retail." The press release says.*

**Then, the company <u>stated</u> in March 2020 that it was airing 26 times per week**, giving it broad coverage in apparently favorable time slots:

*"Monday-Friday, four airings per day, and six airings on the weekends. The animated action-*adventure *series premiered on Nick Jr. in November 2018 with five airings per week and has consistently achieved high ratings with its target demo of Girls 2–5-years-old."*

**But the Rainbow Rangers schedule now says otherwise**.  Most weekdays look like <u>this schedule</u>, from yesterday, **where the show has one time slot on Nick Jr. at 3:49AM EST.**

////

////

////

////

////

////

////

////

////

////

////

////

////

////

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Several platforms show us the same, **indicating it airs 9 times per week, instead of 26**: each morning at 3:49am and then twice additionally on Sunday mornings at 6:00am and 6:30am EST.  We emailed the company to ask about its current number of airings and have not heard back as of this writing.

As Genius's CEO said in the March 2020 press release regarding the show being aired 26 times:

*"Needless to say, leading broadcasters like Nickelodeon don't make schedule changes of this* magnitude *without good reason…"*

He has not commented thus far on the "good reason" for the show airing in the witching hours of early morning only 9 times per week.

Similarly, there is no indication that a Season 3 has been picked up by Nick Jr. We e-mailed both Nick Jr. the company to try to get confirmation of a Season 3 but investor relations simply stated that negotiations were "underway".

We find it surprising that Nick Jr. is still in negotiations.  Other shows such as "PAW Patrol" "Blues Clues" and "Bubble Guppies" were already announced as being picked up by Nickelodeon <u>in February</u>.  Season 2 of Rainbow Rangers was

ordered in April of 2019 in preparation for its release in October.  We are now in June 2020 with no word on the series heading into the fall.

136.     In response to this news, the price of the Company's common stock dropped from $6.86 per share at the close of trading on June 4, 2020, to $5.94 per share at the close of trading on June 5, 2020, a decrease of roughly 13%.

137.     Defendant Heyward stated the following in the June 8 Press Release in response to the Hindenburg Report:

> **We are well positioned to create substantial value** – With Kartoon Channel! launching on June 15 and to be available in more than 100 million U.S. TV households and 200 million mobile devices, we are positioned to be one of the preeminent ad-supported kids' digital *networks*.  The service referred to as a 'Netflix for kids' is made even stronger by the distinct fact that it is a free service. There are no subscriptions fees, it is ad-supported.

138.     The Company filed the June 11 Form 424B3 in which it incorporated by reference the 2019 10-K, the 2020 Proxy Statement, the May 7 Form 8-K, the May 18 Form 8-K, May 28 Form 8-K.  As set forth herein, the June 11 Form 424B3 fails to correct or clarify previous false and misleading statements made in the foregoing documents.

139.     On June 12, 2020, in a press release titled "Genius Brands International Launches The New 'Kartoon Channel!' Monday June 15 in Over 100 Million U.S. Television Households and 200 Million Mobile Devices with Over 4,000 Episodes of Family-Friendly Content" (the "June 12 Press Release") the Company announced the launch of its "new free digital" channel, Kartoon Channel!.  In pertinent part, the June 12 Press Release stated:

> Described as like a '*Netflix for kids, but free,*' *Kartoon Channel!* will have many of the world's most recognized children's brands, from many of the world's most successful creators of children's and family content.  With *content* coming from the late Stan Lee, for example, *distribution* through the likes of Amazon Prime/Amazon Fire, Apple TV/Apple IOS, Android, Roku and DISH, among others; and *proven value building programmers*…like Margaret, David, and Caroline, this is like putting rocket fuel in a Ferrari and having the Championship Formula 1 driving team at the wheel…

* * *

"Unlike other subscription services, *Kartoon Channel!* is an *ad- supported service and will be 100% free, making it available to all.* We believe that is particularly meaningful in these times where many kids are home from school and summer camps, viewership is up, and parents are looking to find cost effective ways to provide positive entertainment. [The channel will go live on Monday with immediate access to the services and more rolling out.]"

140.     The Company launched its Kartoon Channel! on or about June 15, 2020, on various digital platforms including Amazon Channels, the suite of add-on channels available to subscribers of Amazon Prime. However, in contrast to the repeated statements of defendants Heyward and Loesch and Company press releases, Kartoon Channel! came with a price tag of $3.99 per month on top of the cost an Amazon Prime Membership.



141.     Upon launch, investors were soon to realize Kartoon Channel! was only available to Amazon Prime members as an add-on channel with an additional subscription fee.[4] This was in sharp contrast to the repeated statements of the Individual Defendants.

---

[4]  Dan Ariely, PREDICTABLY IRRATIONAL: THE HIDDEN FORCES THAT SHAPE OUR DECISIONS (2d ed. 2010) (explaining the power of "free" demonstrates that "free" is far more effective than "almost free").

142.     In response to this news, the price of the Company's common stock dropped from $4.41 per share at the close of trading on June 15, 2020, to an intra-day low of $3.75 per share, or a loss of almost 15%, before closing at $3.85 per share at the close of trading on June 16, 2020, a decrease of nearly 13% in value.

143.     Despite the truth being revealed to investors that Genius's Kartoon Channel!, was not in fact free, the Company persisted to market Kartoon Channel! as "ad-supported" and "**Fun, Family Friendly, and "FREE!!!**", "FREE", or "Netflix for Kids, but Free" in its July 2020 Investor Presentation and press releases published on July 27, 2020, August 10, 2020, and August 13, 2020.

144.     The Company circulated a press release on June 16, 2020 (the "June 16 Press Release") announcing the new programming slate of content for Kartoon Channel!, in which defendant Heyward stated, in pertinent part:

> "'*Kartoon Channel*!,' our 24-hour, free, video on demand, children's program service went live this morning with unprecedented distribution reach, and an unprecedented initial content lineup."

> "Kids and their parents want uplifting stories.     They want positive messages," added Heyward.  "**It is also important to us that *Kartoon Channel!* is *free and available to everyone*.  It is no less important that the stories are positive and with enriching lessons, whenever possible."

> ***

> Defendant Loesch further stated, in relevant part, that "Having produced and broadcast thousands of children's episodes across a number of the kid's networks, we wanted to make *Kartoon Channel!* stand out as a brand, **not just because it is free and available to everyone**,  but by putting on shows, which tell *positive stories.* That is very very important to us."

(Emphasis added in bold, not italics.)

145.     The Company published a Blog post on June 18, 2020 (the "June 18 Blog Post") announcing that John Landis was joining the production team with Arnold Schwarzenegger, where defendant Heyward stated the following:

> I want all Genius Brands shareholders to understand the significance of this event.
>
> *It would be hard to overstate the importance of a director of John Landis' stature, joining this team to make this program, and the impact we expect to the success of the program, the channel, and* ultimately to Genius Brands revenues and valuation.
>
> ***
>
> *If there was ever a team of champions, that makes* highly profitable blockbuster entertainment*, this is it.*
>
> ***
>
> *When we said that Kartoon Channel! would be like a "Netflix for kids, [sic] but free",* **we *meant* it***!*

146.     In the June 18 Blog Post, defendant Heyward continues to admit that Rainbow Ranger was not, in reality, airing 26 times per week as he had claimed in the Company's March 17 Press Related.  Defendant Heyward stated the following, in relevant part:

> The fact is that [Rainbow Rangers] airings on Nick Jr. have been scaled back while we are currently producing new episodes, which is a standard industry practice known as "resting."

147.     Despite the truth being revealed to investors that Genius's Kartoon Channel!, was not, in fact free, the Company persisted to market Kartoon Channel! as "ad-supported" and "**Fun, Family Friendly, and "FREE!!!**", "FREE", or "Netflix for Kids, but Free" in its July 2020 Investor Presentation and press releases published on July 27, 2020, August 10, 2020, and August 13, 2020.

148.     The statements and omissions referenced in ¶¶ 137-139, 143-147 herein were materially false and misleading and failed to disclose material facts necessary to make the

statements made not false and misleading.  Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public, including: (1) failing to disclose that Rainbow Rangers had not been renewed for a new season on Nick Jr.; (2) failing to disclose that Rainbow Rangers was airing on Nickelodeon only nine times per week, rather than 26 times as Genius had previously represented, and at unfavorable time slots; (3) not disclosing that the economic terms of the deal with Llama Llama, and it did not own the intellectual property for Llama Llama and merely licensed it; (4) failing to disclose that a new wave of selling was likely to pummel the Company's stock as its financial backers sought to lock in profits; (5) posting Stan Lee's Superhero Kindergarten as content on Amazon as self-marketing for the show, which was a far less desirable accomplishment than previously represented; (6) implying Genius had the potential to, like the Walt Disney Company, earn billions of dollars in revenue from the box office, even though Genius had been attempting to launch a show with Stan Lee as early as 2011 and had no meaningful commercial success since that time, let alone the "billions of dollars" of success; and (7) failing to disclose how Mr. Lee's passing would impact Genius's purported ability to replicate Disney's success.

**The Truth Fully Emerges**

149.    The Company announced on July 2, 2020, that it would host a conference call on Monday July 6, 2020, to announce an "exciting business development" through a press release titled "Genius Brands International Chairman & CEO, Andy Heyward, to Host Conference Call to Discuss Key Business Development."

*July 6 Press Release, Shareholders Letter, and Conference Call*

150.     On July 6, 2020, the Company published a press release stating that due to "unprecedented interest," the Company had opened an online portal where investors could listen to the conference call.

151.     The ensuing conference call later that day, July 6, 2020, did not bring the "exciting" or "key business" development that the July 2 Press Release promised.  Instead, defendant Heyward merely announced the creation of a joint venture with POW! Entertainment, Stan Lee Universe, regarding the acquisition of a proprietary right in the intellectual property to the unreleased and untested works created by Stan Lee after his time with Marvel Entertainment.

152.     Defendant Heyward stated, in pertinent part:

> *In all of Hollywood, there is no greater prize*.  This is the Holy Grail.  ***STAN LEE UNIVERSE*** is a *once in a lifetime* asset, drawn from over 100 original, heretofore unexploited properties, created by the most successful creator of intellectual property of our time.  In my view, the potential value in this single asset, is greater than any IP anywhere in Hollywood.

153.     The Company reiterated defendant Heyward's above referenced statements in a press release titled "Genius Brands International Announces Transaction to Create 'Stan Lee Universe.'"

154.     In response to this news, the price of the Company's stock fell from $3.55 per share at the close of trading on July 2, 2020 – the prior trading day – to an intra-day low of $2.58 per share, a loss of over 27%, before closing at $2.66 per share at the end of trading on July 6, 2020, a drop in value of more than 25% on a massive trading volume of approximately 170 million shares.

155.     Later, on July 6, 2020, after the markets closed, *The Motley Fool* published an article titled "Why Genius Brands Stock Plunged 25% Today"[5] calling defendant Heyward's

---

[5] *Available at* https://www.fool.com/investing/2020/07/06/why-genius-brands-stock-plunged-25-today.aspx (last visited August 28, 2020).

1  words used to describe the Company's announcement earlier that day "grandiose statements" and

2  "a little far-fetched, to say the least."

3      156.    The next day, July 7, 2020, *The Motley Fool* published an article titled "Genius

4  Brands Isn't as Smart as It Thinks It Is" (the "July 7 Motley Fool Article"),[6] reporting that the pre-

5  announcement hype created by the Company surrounding the news was unwarranted given the

6

7  news's actual substance.  The July 7 Motley Fool Article claimed, in pertinent part, that "[w]hen

8  you take on the role of being your own hype machine, no one should be surprised when reality

9  falls short of the promise."

10     157.    In pertinent part, the July 7 Motley Fool Article continued:

11
12     "Shares of [Genius] … opened another 17% lower on Tuesday after failing to
       wow investors with a new content announcement that it had been touting since late
13     last week."

14     The slide undoes the stock's 54% surge on Thursday (the final trading day of last
       week) that came after Genius scheduled a conference call for Monday morning
15     this week to discuss what it pitched as an "exciting business development." It turned
       out to be "business development," but the market is arguing that the choice of
16     "exciting" as an adjective wasn't exactly warranted.

17                              **DAMAGES TO GENIUS**

18
19     158.    As a result of the Individual Defendants' wrongful conduct, Genius disseminated

20  false and misleading statements and omitted material information to make such statements not

21  false and misleading when made.  The improper statements have devastated Genius's credibility.

22  Genius has been, and will continue to be, severely damaged and injured by the Individual

23  Defendants' misconduct.

24

25

26

27
   _____
28  [6]   *Available at* https://www.fool.com/investing/2020/07/07/genius-brands-isnt-as-smart-as-it-
       thinks-it-is.aspx (last visited August 28, 2020).

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

159.     Furthermore, aside from ruining the Company's reputation for honesty, integrity, and aptitude, the Individual Defendants have exposed the Company to very expensive legal costs to defend, investigate, and pay judgment or settlement in the Securities Class Action.

160.     As a direct and proximate result of the Individual Defendants' actions as alleged above, Genius's market capitalization has been substantially damaged, losing millions of dollars in value as a result of the conduct described herein.

161.     Moreover, these actions have irreparably damaged Genius's corporate image and goodwill.  For at least the foreseeable future, Genius will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Genius's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

162.     Plaintiff incorporates the allegations herein by reference.

163.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties and other violations of the law.

164.     Plaintiff is a stockholder of Genius, was a stockholder of Genius at the time of the wrongdoing alleged herein and has been a stockholder of Genius continuously since that time.

165.     Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting its rights.

166.     As a result of the facts set forth herein, Plaintiff has not made any demand on the Genius Board to institute this action against the Individual Defendants.  A pre-suit demand on the Board of Genius is futile and, therefore, excused.

167.     At the time of filing of this action, the Board consists of defendants Heyward, Davis, Hallren, Klein, Loesch, Segall, and Thomopoulos (the "Director Defendants"), along with non-party Karen McTier (together with the Director-Defendants, the "Directors").  Plaintiff needs only to allege demand futility as to four of the eight Directors that were on the Board at the time this action was commenced.

**Demand Is Futile as to All Director Defendants**
**Because They Each Face a Substantial Likelihood of Liability**

168.     The Individual Defendants all face a substantial likelihood of liability for their individual misconduct.  The Director Defendants were directors throughout the time of the false and misleading statements, and as such had a fiduciary duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations on behalf of the Company concerning its business, operations, prospects, internal controls, and financial statements were accurate.

169.     Moreover, as directors, the Director Defendants owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective (and were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care.  Instead, the Director Defendants knowingly and/or recklessly allowed, made or authorized false and misleading statements, failed to timely correct such statements, failed to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and were being implemented effectively), and failed to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence.  These actions constitute breaches of the fiduciary duties of loyalty and good faith, for which the Individual Defendants face a substantial

likelihood of liability.  If the Director Defendants were to bring a suit on behalf of Genius to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability.  This is something they will not do.  For this reason, demand is futile as to the Individual Defendants.

170.     Further, the Director Defendants all signed the 2019 10-K, and thus personally made the false and misleading statements in the 2019 10-K.

171.     Further, defendant Heyward is incapable of considering a demand to commence and vigorously prosecute this action because he is the founder of the Company and has served as the Company's Chairman of the Board and CEO since 2013.  Indeed, the Company admits that Heyward is not independent.   The Company provides defendant Heyward with his principal occupation, and he receives handsome compensation, including $411,500 during fiscal year 2019.  Defendant Heyward also received proceeds of over $1.3 million as a result of an insider transaction executed during the period when the Company's stock price was artificially inflated due to the false and misleading statements alleged herein.  Therefore, demand in this case is futile as to him, and thus excused.

**Demand Is Excused as to Defendants Davis and Heyward**
**Because of Their Overlapping Business Affiliation with Each Other**

172.     Demand is excused as to defendants Davis and Heyward because of their overlapping business affiliations.  Due to their close relationships, and conflicts of interests arising therefrom, defendants Davis and Heyward cannot take the necessary and proper steps to investigate and remedy the Individual Defendants' wrongdoing.  Defendant Heyward is the co-founder and served as the CEO of DIC Animation City until its sale to Capital Cities/ABC, Inc., where defendant Davis had served as a member director.  Defendants Davis and Heyward are

incapable of independently and impartially consider a demand to commence and vigorously prosecute this action.

**Demand Is Excused as to the Audit Committee Defendants**
**Because They Face a Substantial Likelihood of Liability**

173.     As members of the Audit Committee during the Relevant Period, the Audit Committee Defendants participated in and knowingly approved the filing of false financial statements and allowed the Individual Defendants to repeatedly make other false and misleading statements to the investing public.  More specifically, as members of the Audit Committee, the Audit Committee Defendants were obligated to oversee and monitor (a) the integrity of the Company's financial statements, and (b) the Company's compliance with legal and regulatory requirements.  Instead, the Audit Committee Defendants failed to ensure the integrity of the Company's financial statements and financial reporting process, the Company's systems of internal accounting and financial controls, and compliance with legal and regulatory requirements, as required by the Charter.  For this reason, demand is futile as to the Audit Committee Defendants.

## FIRST CLAIM

### Against Individual Defendants for Violations of
### Section 14(a) of the Exchange Act

174.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

175.     The Section 14(a) Exchange Act claims alleged herein are based solely on negligence.  They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants.  The Section 14(a) claims alleged herein do not allege and do not sound in fraud.  Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

176.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

177.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

178.    Under the direction and watch of the Directors, the 2020 Proxy Statement failed to disclose, *inter alia*, that: (1) Rainbow Rangers was airing on Nickelodeon only nine times per week, rather than 26 times as Genius had previously represented, and at unfavorable time slots; (2) Kartoon Channel! would be available to Amazon Prime members only as an add-on channel for an additional subscription fee; (3) Kartoon Channel! platform was not as robust of an offering as the Individual Defendants purported; (4) the commercial viability of the Company was overstated in light of the true accuracy of the Company's products and assets; and (5) the Company failed to maintain internal controls. Due to the foregoing, the Company's public statements were materially false and misleading at all relevant times.

179.    The Individual Defendants also caused the 2020 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-

performance" elements, while failing to disclose that the Company's financial prospects were misrepresented as a result of false and misleading statements, causing the Company's share price to be artificially inflated and allowing the Individual Defendants to wrongfully benefit from the fraud alleged herein.

180.    Moreover, the 2020 Proxy Statement was false and misleading when it discussed the Company's adherence to specific governance policies and procedures, due to the Individual Defendants' failures to abide by them and their engagement in the scheme to issue false and misleading statements and omissions of material fact.

181.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2020 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2020 Proxy Statement, including, but not limited to, election of directors, approval of the Issuance Proposal 1, approval of the Issuance Proposal 2, approval of the Amendment Proposal, ratification of the Company's independent auditor, and advisory approval of executive compensation.

182.    The false and misleading elements of the 2020 Proxy Statement led to the approval of Issuance Proposals 1 and 2, rejection of the Amendment Proposal, and to the re-election of defendants Heyward, Davis, Hallren, Klein, Loesch, Segall, and Thomopoulos, which allowed them to continue breaching their fiduciary duties to Genius.

183.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2020 Proxy Statement.

184.    Plaintiff on behalf of Genius has no adequate remedy at law.

59

1

2

### SECOND CLAIM

### Against Individual Defendants for Breach of Fiduciary Duty

3

4

185.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

5

6

7

186.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Genius's business and affairs.

8

9

187.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

10

11

12

13

14

188.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Genius.

15

16

189.    In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

17

18

19

20

21

22

23

24

25

26

27

190.    In further breach of their fiduciary duties owed to Genius, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) Rainbow Rangers was airing on Nickelodeon only nine times per week, rather than 26 times as Genius had previously represented, and at unfavorable time slots; (2) Kartoon Channel! would be available to Amazon Prime members only as an add-on channel for an additional subscription fee; (3) Kartoon Channel! platform was not as robust of an offering as the Individual Defendants purported; (4) the commercial viability of the Company was overstated in light of the true accuracy of the Company's products and assets; and (5) the Company failed to maintain internal

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   controls.  Due to the foregoing, the Company's public statements were materially false and

2   misleading at all relevant times.

3        191.   The Individual Defendants failed to correct and caused the Company to fail to

4   rectify any of the wrongs described herein or correct the false and misleading statements and

5   omissions of material fact referenced herein, rendering them personally liable to the Company

6   for breaching their fiduciary duties.

7

8        192.   In breach of his fiduciary duties, one of the Individual Defendants, Heyward,

9   made a lucrative insider sale while the price of the Company's common stock was artificially

10   inflated due to the false and misleading statements of material fact discussed herein.

11

12        193.   The Individual Defendants had actual or constructive knowledge that the

13   Company issued materially false and misleading statements, and they failed to correct the

14   Company's public statements.   The Individual Defendants had actual knowledge of the

15   misrepresentations and omissions of material facts set forth herein, or acted with reckless

16   disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such

17   facts were available to them.  Such material misrepresentations and omissions were committed

18   knowingly or recklessly and for the purpose and effect of artificially inflating the price of the

19   Company's securities and disguising insider sales.

20

21        194.   The Individual Defendants had actual or constructive knowledge that they had

22   caused the Company to improperly engage in the scheme set forth herein and to fail  to  maintain

23   adequate internal controls.  The Individual Defendants had actual knowledge that the Company

24   was engaging in the scheme set forth herein, and that internal controls were not adequately

25   maintained, or acted with reckless disregard for the truth, in that they caused the Company to

26   improperly engage in the scheme and to fail to maintain adequate internal controls, even though

27

28

center

61

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

such facts were available to them.  Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and engaging in insider sales.   The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

195.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

196.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Genius has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

197.     Plaintiff on behalf of Genius has no adequate remedy at law.

### THIRD CLAIM

### Against Individual Defendants for Unjust Enrichment

198.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

199.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Genius.

200.     The Individual Defendants either benefitted financially from the improper conduct and their making lucrative insider sales, received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Genius that was tied to the performance or artificially inflated valuation of Genius, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

201.    Plaintiff, as a shareholder and representative of Genius, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits— including from insider sales, benefits, and other compensation, including any performance- based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

202.    Plaintiff on behalf of Genius has no adequate remedy at law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A.    Declaring that Plaintiff may maintain this derivative action on behalf of Genius and that Plaintiff is a proper and adequate representative of the Company;

B.    Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and violations of the federal securities laws;

C.    Granting appropriate equitable relief to remedy Individual Defendants' breaches of fiduciary duties and other violations of law;

D.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees and costs and expenses; and

////

////

////

////

////

////

////

63
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1

E.      Granting such other and further relief as the Court deems just and proper.

2

**JURY TRIAL DEMAND**

3

Plaintiff hereby demands a trial by jury.

4

Dated: March 22, 2021

5

6
                                              Respectfully Submitted,

7
                                              **LEVERTY & ASSOCIATES LAW CHTD.**

8
                                              */s/ William R. Ginn*

9                                             Patrick R. Leverty, Esq.,
                                              William R. Ginn, Esq.,
10                                            Reno Gould House
                                              832 Willow Street
11                                            Reno, NV 89502
                                              Telephone: (775) 322-6636
12                                            Facsimile: (775) 322-3953
                                              Email: pat@levertylaw.com
13                                                        bill@levertylaw.com

14
                                              *Attorney for Plaintiff*

15
                                              *OF COUNSEL:*

16

17                                            **BRAGAR EAGEL & SQUIRE, P.C.**
                                              Garam Choe
18                                            810 Seventh Avenue
                                              Suite 620
19                                            New York, New York 10019
                                              Telephone: (212) 355-4648
20

21

22

23

24

25

26

27

28